I'm going to take up our next, excuse me, case, which is Minimeltz v. Minimeltz. Thank you. Just wait one second. Okay, go right ahead. I may please the Court. My name is Bill Mandia. I represent the appellants, Cross-Appellees, in this appeal. We're asking that the Court do three things, essentially. One, we're asking that the Court reverse the District Court's finding in favor of the appellees on summary judgment that the purchase option contained in the binding manufacturing and distribution agreement between the parties was simply an agreement to agree and, therefore, unenforceable. We're also asking that the Court remand with direction that summary judgment be entered in our favor because we think that the purchase option is enforceable for all the reasons we've set forth in the District Court in our briefing. And then the third thing is on the cross appeal, we do ask that the Court affirm the District Court's ruling in our favor that dismissed the counterclaim for breach of the covenant of good faith and fair dealing. There's two principal reasons why we argue the District Court erred. Can I ask you a threshold question? The parties had sent in a request to postpone argument because it looks like there's a settlement of this case? There's an agreement in principle that involves a transaction that is much larger in scale and more complicated than this one, and it would only be upon the closing of that transaction if it were to close. There are certain things that would have to happen in that transaction that don't have to happen in connection with the one we're trying to specifically enforce that would lead to eventually a binding definitive purchase and sale agreement. What we have right now is a non-binding letter of intent like we would in other M&A contexts. One of the conditions in there is that if we reach a closing on that deal, again, different in scale and size and scope, but if we reach a closing, then this would be released because this is subsumed within it. But at this point, we don't have a binding agreement. So our request was just for an adjournment and a stay to see if the parties could complete that. We are respectful and mindful of the Court's time, and so we're here today. We're prepared to argue, and we think that we should proceed with argument. When will you know whether the deal is going to happen? The letter of intent provides a 60 to 90-day period for closing, so we're trying our best to close it as quickly as we can. Thank you. So there are two grounds we primarily argue with regard to the district court's ruling that we believe is where it erred. One, we believe that it misconstrued the purchase option in the agreement as an agreement to agree as opposed to what we say it is a binding purchase option that formed a bilateral contract when we accepted that option, which was an irrevocable offer by telling the appellees that we had the $3 million that was required for it, that we were prepared to buy the assets that were identified in there, and we had tendered a purchase agreement to them that would effectuate that transaction. The second reason why we believe the court erred is that we believe it misapplied Connecticut law and fundamental principles of contract interpretation. As we set forth in our briefing, for a purchase option to be enforceable under Connecticut law, the parties have to have agreed to what are the minimum essential terms, which are generally viewed as a purchase price, the assets to be acquired, and the time within which you have to acquire those assets. Here, this provision includes all of those requirements. It identifies the purchase price of $3 million. It identifies specific assets, trademark, two patents, equipment that's leased or licensed currently under the manufacturing and distribution agreement. Now, it does go on to say that that would be pursuant to a mutually acceptable purchase agreement that meets the criteria of the deal terms document. The deal terms document, which the court probably gleaned from the briefing, was the letter of intent that led to the manufacturing and distribution agreement. So what does mutually acceptable mean? Does no work in that agreement? It means essentially that the parties, the form of the writing, the parties have to agree to, right? I mean, at the end of the day, I think all agreements have to be, when you present someone with an agreement, it has to be mutually acceptable in order for them to sign it. But what it doesn't prevent is license or leeway to the appellees to do what they want to do and have tried to do here, which is essentially retrade a deal that they didn't like after they entered into it. They extended this offer. The appellees performed under this contract for years, very successfully so, based on the belief as written in their contract that they had a right to purchase. And that's what they did. And then the rug was pulled out from under them because the appellees wanted more money. With respect to the mutually agreeable purchase agreement, though, why wouldn't that allow your adversary to do what it did without a mutually agreeable purchase agreement? You start drafting an agreement, and, you know, they come up with some reason that they don't like a term, and they walk away from the deal. I mean, are you saying that they had to at least negotiate a purchase agreement, but then they could pull out for almost any reason? No, they can't walk away from the deal. So the essential terms are agreed to. We have the purchase price, and we have the assets to be acquired. If they did not have a mutually acceptable purchase agreement, where would they not, where would they permissibly not find it mutually acceptable? Well, for instance, if we tried to include an asset in the purchase agreement that they said was not part of the transaction, then that would be a fair basis to say it's not mutually acceptable. But we haven't done that. They haven't said that we had. I mean, nobody in this case ever, district court judge, the appellees, have ever identified any essential term that's missing, nor has there really ever been any explanation for why this would be put into the contract, a binding comprehensive contract with a purchase price identified and assets to be acquired, if it was intended to be non-binding. It would serve no purpose. And there's other references throughout the ---- Would it be permissible if you wanted to close, and I'm just picking numbers out of thin air, on October 1st, and they said, no, we don't want to close until after the new year or whatever? No. I mean, is that the kind of thing that could permissibly allow them to walk away from the deal? I don't think it would allow them to walk away from the deal. They would have to show up to a closing. We would have to agree on a date and time, and I don't think they could refuse indefinitely into the future to kill the deal. I think in that instance, the district court ---- To a suggestion that the obligation was to bargain with you in good faith toward a mutually acceptable purchase agreement. Right. Under Connecticut law, what the case law says is once the parties have agreed to the essential terms, they're free to negotiate on other matters that are non-essential. That doesn't change the fact that they have a binding and enforceable agreement at the moment that they've agreed to those terms. And if there were, then there's never been a suggestion there were, but if we had proposed terms that they felt we hadn't agreed already to be bound to in that agreement we proposed, they could have came back and said those need to come out. But that doesn't prevent contract formation. What if there was a good faith disagreement in the negotiations about something like a closing date that is not provided for in the earlier letter of intent type agreement? Am I correct in assuming that Connecticut law would say neither side can walk away from the deal at that point and a court would have to sort of arbitrate a date according to whatever reasonable commercial practice or something like that? Yeah. I mean, again, I don't think that that kind of thing is something that what I would view as a technicality regarding the closing date would allow particularly on the other side of this where we're paying. We have the money, right? So we're ready to go. I'm not sure what the hesitation would be. Well, that was just an example. But what you're saying is under Connecticut law an option agreement that says what's going to be bought and for what price, and particularly maybe where it also references some of the terms by the reference to the other agreement. But it's got the essentials. And it's not that there has to be agreement on every trivial detail or one side gets to walk away. But even if there's a good faith dispute about some of the details, the court can fill in the things that aren't agreeable. Yeah, and I think there are cases, this is not a central focus of our brief, but there are cases dealing with option contracts where courts have been put in that position. For instance, some of the case law we cite, there was a fight over what was the manner of payment going to be? Was it going to be in a certified check or a wire? And in those instances, the courts say, you know, we could step in and imply what's commercially reasonable and what typically happens in the context of one of these transactions. And I think something like timing of a closing, the court could say, a transaction like this should take 60 days to close or something reasonable. And can I just ask a question about the SS2 LLC case in the Connecticut Supreme Court, which I think comes actually, it's almost simultaneous with the Bayer case. Yes. Are you distinguishing that basically on the ground that the thing that was still in dispute was actually the price? Right, exactly. Yes, Your Honor, that's correct. There was no agreement as to the price. Because there was this environmental set off or whatever that was supposed to happen. Right, there was some complicated formula, and it was very clear that the parties had to agree to that. And we would never contest that that's not the price. It's one of the most essential terms besides what you're buying. So, you know, our position is that's distinguishable because it's not really a situation where the parties weren't able to agree to terms in a writing later. Thank you, Mr. Mandia. You've got a few minutes on rebuttal. Thank you. We'll hear from Mr. Ainsworth. May it please the Court. My name is Keith Ainsworth. I'm of the New Haven Connecticut Bar. It's my privilege to represent Minnie Meltz and Tom Mosey today. What we're here to decide is foundational elements of commercial law. Commercial parties contracting. In that case, if we're supposed to decide that, aren't you saying we should send this to the Connecticut Supreme Court? Because we're not supposed to be deciding fundamental issues of commercial law under the law of Connecticut. If it's really a matter of that magnitude, it's for them, right? Well, it's established law. The established black letter law is that if parties draft a contract using specific language that says we need to agree to another specific writing, then the Court should enforce that. This didn't break down over a failure to reach agreement on the purchase agreement. This broke down because you said we don't even want to talk about it. Am I right? I would respectfully disagree. Tell me at what point this broke down because I thought you never engaged with them on what might be mutually acceptable purchase agreement. You just said you didn't want to sell. Well, first because we had an MDA which was detailed in many respects. And that was a functioning agreement. Everyone made money on that, and that was appropriate. It's an agreement that has a termination by purchase clause. And my question, as you can probably gather from my questions to your adversaries, was does this termination by purchase agreement obligate your client, when the other side is there with $3 million in hand and ready to buy, to at least enter into negotiations for a mutually acceptable purchase agreement? Not at all. Why not? Because the parties specifically, sophisticated parties represented by counsel, put into their agreement that there must be a mutually acceptable agreement in the future. And then it goes on and compounds this by incorporating by reference a document which on its face specifically says these terms are not binding and Right, but it doesn't say that it has to be executed with that agreement. It says executed to meet the criteria. So once it's in the purchase agreement, that's how they'll become binding, those terms. But they've referred to that document, and essentially in an integrated contract, they have written those terms of the deal terms document into 20C. 20C is now a very long paragraph, the bottom of which they've incorporated by reference very specific language, which says seller may reserve the rights to reject all offers. What is the significance of the inserting the $3 million price into this paragraph if what it really means is you can terminate this management agreement, which is a certain kind of relationship between the parties, if you buy the whole shoot and match according to some agreement that we make in the future? That's what you're saying it really means, right? Well, yes, but it's— Because you'd be entirely free when they show up with their $3 million to say, no, I want four, right, under your interpretation. Times have changed. I'd really like more money than $3 million. Well, actually, it's fairly clear that the parties could agree on a very detailed transaction with regard to operating the business. But for an acquisition sale, typically those are reduced to a much more detailed writing. The case law refers to real estate— What I'm saying is you're saying that by stipulating that there needs to be some mutual agreement, that essentially vitiates the $3 million price, right, because not only could you sort of mess around with dickering over the small terms, your position isn't really that. Your position is the whole thing is nonbinding at this point, so you're perfectly free to say, yeah, I don't think $3 million is enough anymore. That's true because also the deal terms has a time is of the essence clause, and this is now occurring several years later. So if we're— So my point is, my question is, why include that $3 million? I mean, that would seem to me to— If we're trying to look at what is the meaning of this agreement according to the plain intent, on the one hand, your argument in part is if the other side is right, that reads pursuant to a mutually acceptable agreement out of the contract, but I'm suggesting that your interpretation reads $3 million out of the contract. And indeed, the option provision doesn't say you can terminate if we work out a deal for you to buy it for $3 million. It says you can terminate upon the payment of $3 million pursuant to a mutually acceptable agreement, which sounds a little different to me. It does. Clearly, the negotiations were complete, and I think what this was, it was a place marker saying we can't agree on this other purchase agreement because, remember, the deal terms document was a two-phased transaction. Phase one is turnover of the operations. The second is a sale. What happened is this was only an MDA, manufacturing distribution, not manufacturing distribution and purchase. 20C is clearly a place marker for the future, for actions that need to occur in the future, and here's the status of the negotiations as they were at that time, and with very conditional language. Let me ask you about the following phrase, though, after a mutually acceptable purchase agreement. It says that meets the criteria of the deal terms document executed by the parties in December. Doesn't that limit the scope of the mutually acceptable purchase agreement? In other words, doesn't it mean that as long as you meet the deal terms, then we're going to have an agreement? That's assuming that the deal terms and the MDA are identical because now you've integrated.  Or supplemental. The deal terms would supplement the MDA by adding them to whatever purchase agreement you had. Well, the deal terms are, first of all, not absolute. You've incorporated. Any party could have taken their sharpie and stricken out that these terms are not binding or seller preserves the right or could have stricken out with their sharpie mutually agreeable. Those two terms suggest that the negotiations were open at the time of the MDA and that the purchase was now going to be subject to additional negotiations at the time that they resumed them. And the deal terms do change. The purchase price in the deal terms was $3 million with a credit for purchasers' royalty payments or sales of territories. But then the MDA says it's $3 million with credits for the owner's share of exclusive territory fees. But now you've reincorporated by reference a document which is now inconsistent. So now you've got a circular issue on what really constitutes the purchase price. That purchase price remains open because you've now incorporated a document. Sophisticated parties represented by counsel took a document that on its face had inconsistencies and a disclaimer, which they could have stricken, two strokes of a pen. And they didn't, which indicates on its face that the parties did not intend to be bound by that document and yet that there would be a future writing that they would both find mutually agreeable based on the conditions presumably at the time that they resumed those negotiations. We have ambiguity in the contract as to what it means for the parties to agree to termination by purchase pursuant to a mutually acceptable purchase agreement. I do not believe so because these are plain English words that are fairly clear. Mutually acceptable is mutually acceptable. I have to agree. You have to agree. You say it's even mutually acceptable allows you to renegotiate a price that's specified in here. That might not seem apparent. And to that extent, I mean, you got summary judgment in this case. The arguments you're making suggest to me that there might be questions about the scope of what was envisioned by mutually acceptable purchase agreement. When your adversary argues it means nothing more than meeting the criteria of the deal terms and reaching agreement on, you know, where the closing will be and on what date and less significant matters such as that. Well, it's in the context of the law. And if you look at show motion and the cases cited in it, they all cite to real estate deals which are typically done with a check and a deed. And then there's ubiquitously across the country we use standard forms for real estate deals. But on a mergers and acquisition, asset sale for a manufacturing operation, rarely there are no forms. They're hand drafted. They're usually 65 pages. And there's all sorts of ‑‑ I see my time is up. But there are all sorts of tax characterizations. There are many things that go into these that dictate the reason why there needs to be a formal writing for this kind of transaction as opposed to show motion and the other cases, the Iowa case, where they cited to a form typically used in St. Joseph County for real estate contracts. Even Bridge Street, the reason why SS2 was cited by the court was because there was an open term that needed to be agreed upon. That ELR term. It's a handcrafted thing. That's essentially the same thing here. We have a complex transaction that isn't just we've agreed on a price and some assets. The characterization of them and how the parties are going to continue in the future to deal with each other, such as the noncompetition agreement terminates when the agreement terminates, no matter how it terminates. So that still needs to be negotiated because there's an international operation and a domestic operation. Only the domestic operation was up for sale. Thank you, Mr. Ainsworth. Mr. Mandia, you have a few minutes left for rebuttal. Very brief. The parties didn't leave anything open as it pertains to the essential terms for this deal, and you don't need to look any further than the document itself to determine that's the case. I'll take Mr. Ainsworth at his word. I wasn't part of the transaction. There were lawyers on both sides. Would a lawyer spot this and say, you know, we might have a problem closing this deal? But my point, that's where I was going to go. I'll take him at his word. There were sophisticated lawyers involved. I wasn't involved in the deal. I'm not saying you. I'm saying lawyers on both sides of the deal. If you're a lawyer, you read this, you say, oops, maybe we've got to talk about this a little bit, right? I would say that you wouldn't because if there was no deal, no one would be putting that into the agreement. It makes no sense. I don't know why any lawyer that would advise their client if they were saying they weren't being bound to it to put something like that in there with a specific purchase price and other things. And while there's no reason to resort to any parole evidence, this is very clear on its face, but we did cite in our briefs below and in our brief here. Both sides think it's clear on its face, not its directions. But there's an email from Mr. Mosey where he told his lawyer, and they produced it. The lawyer said, you may not want to put the purchase price in here because things could change and you might want more money later. And he says, oh, no, I agreed to that. I agreed to the $3 million. So I find it hard to believe that his lawyer, who is a – That sounds like extrinsic evidence that would allow the district court to consider. But in any event, it wouldn't be in there. And, again, if the parties – I think the fundamental failing is this is not a provisional letter of intent. I think the Ambrose case from the Seventh Circuit does a nice job of explaining this. And the reason why – the difference between a letter of an intent and an option, and the reason I bring this up is the argument that this says manufacturing and distribution agreement but not manufacturing, distribution, and purchase agreement. It doesn't have to say that. There's all kinds of lease agreements, commercial lease agreements, and other things that contain purchase options in them. They are not purchase agreements. They do become a binding agreement when the optionee accepts the option. That's clear. And at that point, the parties oftentimes do, and this is discussed in the Ambrose case, they do have to sit down and paper their final transaction, which is really all that needs to happen here. You know, to the point about the deal terms in the non-binding language, I think that's all subsumed in the fact that this is a fully integrated contract, and that kind of goes to the wayside. But, again, why would these sophisticated lawyers, if that reference was intended to make it non-binding, go through all those different steps to try to get there? Why wouldn't they just say this is not binding? They certainly knew how to do it when they did the term sheet. So unless there's further questions, I have nothing else to add. The only thing I'd ask is it may take a while for us to sort this out. We don't know that yet or not. But it would be helpful if you kept us posted on the settlement developments. Perhaps every 30 days you could just ---- We'd be happy to do that. We did mention in our motion when we made that request that we would do that. We're happy to do that as we go along, for sure. I had some slight concern about having this argument on the theory that we might screw up your negotiations because it would seem so clear that one side was going to prevail here that that would change the dynamic. But I suspect that what you've heard is that this is a very close matter, and if either side wants to factor the potential result of this appeal into your negotiations, you can only do that on the theory of do I feel lucky because it certainly sounds like we've got a lot to chew on in this appeal if we have to decide it. Understood. Thank you. So you sent us a letter every 30 days telling us where we are? Yeah. And is that something we should just ---- We're the clerk's office. Okay. That's fine. It's on the docket. Okay. Excellent. Thank you. Okay. Thank you both. We'll reserve decision on this case. And thank you.